# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA

RESOLUTE FOREST PRODUCTS, INC., *et al.*,  )
                                             )
                    Plaintiffs,  )
                                             )     CIVIL ACTION FILE
     v.                                 )     NO. CV116-071
                                             )
GREENPEACE INTERNATIONAL, *et al.*,    )
                                           )
                    Defendants.  )
                                           )

## GREENPEACE DEFENDANTS' MOTION TO STRIKE PURSUANT TO O.C.G.A. § 9-11-11.1 AND MEMORANDUM IN SUPPORT

Defendants Greenpeace International ("GPI"), Greenpeace, Inc. ("GP Inc."), Greenpeace Fund, Inc. ("GP Fund"), Daniel Brindis, Amy Moas, Matthew Daggett, and Rolf Skar (collectively, the "Greenpeace Defendants") bring this motion to strike the Complaint of Resolute Forest Products, Inc., Resolute FP US, Inc., Resolute FP Augusta, LLC ("Resolute Augusta"), Fibrek General Partnership, Fibrek U.S., Inc., Fibrek International Inc., and Resolute FP Canada, Inc. (collectively, "RFP") and for an award of attorneys fees and expenses of litigation pursuant to the Georgia anti-SLAPP statute, O.C.G.A. § 9-11-11.1. Concurrently, the Greenpeace Defendants each move to dismiss the complaint subject to Rule 12(b)(6).

## INTRODUCTION

In 1994, a California appellate court, applying California's then-recently enacted statute addressing Strategic Lawsuits Against Public Participation ("SLAPP"), observed:

> The paradigm SLAPP is a suit filed by a large land developer against environmental activists or a neighborhood association intended to chill the defendants' continued political or legal opposition to the developers' plans. SLAPPs, however, are by no means limited to environmental issues … nor are the defendants necessarily local organizations with limited resources.

*Wilcox v. Superior Ct.*, 33 Cal. Rptr. 2d 446, 449 (Cal. Ct. App. 1994) ("[F]avored causes of

action in SLAPP suits are defamation, various business torts such as interference with prospective economic advantage, nuisance and intentional infliction of emotional distress [in which plaintiffs] ask for damages which would be ruinous to the defendants.") (citing *Gordon v. Marrone*, 590 N.Y.S.2d 649, 651 (Sup. Ct. 1992) (frivolous challenge to tax exemption for nature preserve);[1] *Protect Our Mountain Env't, Inc. v. District Ct.*, 677 P.2d 1361, 1364 (Colo. 1984) (en banc) (abuse of process and civil conspiracy claims by developer against environmental group); *Webb v. Fury*, 282 S.E.2d 28 (W. Va. 1981) (libel claim by coal company against environmental groups); Note, *Counterclaim and Countersuit Harassment of Private Environmental Plaintiffs: The Problem, Its Implications, and Proposed Solutions*, 74 Mich. L. Rev. 106, 112, 113 (1975); *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155, 157 (3d Cir. 1988).)

For the proposition that SLAPP defendants are not limited to local organizations, the court cited *Sierra Club v. Butz*, 349 F. Supp. 934 (N.D. Cal. 1972), widely considered one of the precursor cases leading to the anti-SLAPP statutes that have now been enacted in many states. In that case, the Sierra Club sued to temporarily prohibit logging in a primitive forest in order to prevent despoliation that could have disqualified the forest from consideration as a national wilderness area. One of the defendants, timber company Humboldt Fir, filed state tort counterclaims based on interference with advantageous relationship, and the court dismissed those claims in light of the First Amendment guarantee of the right to petition the government for redress of grievances, citing *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and other key cases. *Butz*, 349 F. Supp. at 936-39.

---

[1] In *Gordon*, the court noted: "SLAPP suits function by forcing the target into the judicial arena where the SLAPP filer foists upon the target the expenses of a defense. The longer the litigation can be stretched out, the more litigation that can be churned, the greater the expense that is inflicted and the closer the SLAPP filer moves to success. The purpose of such gamesmanship ranges from simple retribution for past activism to discouraging future activism." 590 N.Y.S.2d at 656 (footnote omitted).

Almost 45 years later, the "paradigm" SLAPP lawsuit seemingly has not vanished – it has just attempted to change its stripes.  Yet another forestry company has sued yet more environmental groups in an effort to muzzle protected speech – here, statements about the company's poor environmental record – disguised not just as state tort claims, but also as federal and state RICO causes of action. Georgia, however, recognizes the inherent dangers posed by SLAPP suits, and however styled, RFP's claims must be dismissed under the applicable statute, O.C.G.A. § 9-11-11.1, for all of the reasons set forth below.[2]

## A.     Application of the Georgia Anti-SLAPP Statute

### 1.     History of Anti-SLAPP Legislation in Georgia

Georgia's anti-SLAPP statute was enacted in 1996, and in doing so "the legislature declared, "it is in the public interest to encourage participation by the citizens of Georgia in matters of public significance through the exercise of their constitutional rights of freedom of speech and the right to petition government for redress of grievances," finding "that the valid exercise of [these] constitutional rights ... should not be chilled through abuse of the judicial process." *Providence Constr. Co. v. Bauer*, 494 S.E.2d 527, 528 (Ga. Ct. App. 1997) (citing O.C.G.A. § 9-11-11.1(a)) (upholding dismissal of claims for breach of contract and tortious interference in connection with defendants' circulation of "petitions opposing rezoning, writing letters to county officials and speaking out before [a planning commission]" in suit by developer to enjoin residents of a subdivision from opposing rezoning, *id.* at 679).

The 1996 statute was limited to the right to petition the government for the redress of grievances on matters of public concern.  *Browns Mill Dev. Co. v. Denton*, 543 S.E.2d 65, 69

---

[2] Alternatively, as discussed in the Greenpeace Defendants' motion to dismiss, if the Court does not dismiss this case for improper venue or transfer to the Northern District of California, the applicable choice of law analysis indicates that this Court should apply California law to RFP's claims. As such, the California anti-SLAPP statute would apply, and the cases cited herein, many of which interpret the California statute, apply with even greater force.

(Ga. Ct. App. 2000) (upholding dismissal of defamation claim against environmental activist who disseminated memorandum opposing a rezoning application to government officials and a document opposing "irresponsible land use patterns in DeKalb County as it affects soil and water" to the media and government officials, *id.* at 67), *aff'd*, 561 S.E.2d 431 (Ga. 2002). Although limited to public petition, the provision created "an 'expansive definition' of protected speech, which includes 'any statement made to any official proceeding authorized by law; or any statement made *in connection with an issue under consideration* by any official proceeding.'" *Adventure Outdoors, Inc. v. Bloomberg*, 705 S.E.2d 241, 245 (Ga. Ct. App. 2010) (citing *Metzler v. Rowell*, 547 S.E.2d 311, 314 (Ga. Ct. App. 2001)) (applying anti-SLAPP statute press conference held to address issue under consideration by federal court in New York).

Georgia federal district courts that heard cases implicating the 1996 anti-SLAPP statute held it to be applicable in federal court, following cases interpreting the California anti-SLAPP statute. *AirTran Airlines, Inc. v. Plain Dealer Publ'g Co.*, 66 F. Supp. 2d 1355, 1369 (N.D. Ga. 1999); *Buckley v. DIRECTV, Inc.*, 276 F. Supp. 2d 1271, 1275 n.5 (N.D. Ga. 2003).

In 2007, the Northern District of Georgia held that the verification procedure in the Georgia statute – a provision not present in the California statute – conflicted with federal law and thus could not be applied in federal court. *Adventure Outdoors, Inc. v. Bloomberg*, 519 F. Supp. 2d 1258 (N.D. Ga. 2007), *reversed*, 552 F.3d 1290 (11th Cir. 2008). The court noted, however, that substantive provisions of the statute, including the motion to strike and award of attorneys fees and costs, **were** available in federal court. *Id.* at 1278-79 (citing *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 970-73 (9th Cir. 1999)). Subsequently, the Eleventh Circuit also held that the verification procedure of the 1996 Georgia anti-SLAPP statute was inapplicable in federal court. *Royalty Network, Inc. v. Harris*, 756 F.3d

1351, 1357 (11th Cir. 2014) (citations omitted). The court contrasted Georgia's verification procedure with statutes in other states where courts had found the state anti-SLAPP statute available in federal court because their provisions did not conflict with federal rules. *Id.* at 1361-62 (citing *Henry v. Lake Charles Am. Press, LLC*, 566 F.3d 164, 168-69 (5th Cir. 2009); *Godin v. Schencks*, 629 F.3d 79, 86-87 (1st Cir. 2010)).[3] As discussed below, the Georgia legislature has now amended the anti-SLAPP statute to eliminate the verification procedure, thus mooting the holding in *Royalty Network.*

### 2. The Current Anti-SLAPP Statute

In early 2016, the Georgia Assembly passed a bill to "update[] Georgia's anti-SLAPP legislation to increase the coverage from protecting the right to petition to also include the right of free speech in connection with an issue of public interest or concern." *See* GA H.R. Daily Rep., 2016 Reg. Sess. No. 39 (Mar. 23, 2016). The new statute, which was signed into law on April 26, 2016, took effect on July 1, 2016,[4] and closely tracks the provisions of the California anti-SLAPP statute. *Compare* O.C.G.A. § 9-11-11.1 *with* Cal. Civ. Proc. Code § 425.16. By eliminating the verification procedure that recently rendered the prior statute inapplicable in federal court under *Royalty Network*, and tracking the California statute, the legislature significantly broadened the application of the statute.

Under the current Georgia anti-SLAPP statute, "[a] claim for relief against a person or entity arising from any act of such person or entity which could reasonably be construed as an act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with

---

[3]   *But see Abbas v. Foreign Policy Grp.*, 783 F.3d 1328 (D.C. Cir. 2015) (declining to apply D.C. Anti-SLAPP law).

[4]   Declaration of Lacy H. Koonce, III ("Koonce Decl."), Ex. 1 (Georgia General Assembly webpage on H.B. 513 from the 2015-2016 Regular Session ).

an issue of public interest or concern shall be subject to a motion to strike …." O.C.G.A. § 9-11-11.1(b)(1). The Georgia anti-SLAPP statute broadly protects the discussion of issues of concern to the public:

> The General Assembly of Georgia finds and declares that it is in the public interest to encourage participation by the citizens of Georgia in matters of public significance and public interest through the exercise of their constitutional rights of petition and freedom of speech. The General Assembly of Georgia further finds and declares that the valid exercise of the constitutional rights of petition and freedom of speech should not be chilled through abuse of the judicial process. To accomplish the declarations provided for under this subsection, this Code section shall be construed broadly.

O.C.G.A. § 9-11-11.1(a). Consistent with the legislative mandate of a broad protection statute, acts in furtherance of a person's right of petition or free speech on matters of public interest or concern include:

> (1) Any written or oral statement or writing or petition made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law;
>
> (2) Any written or oral statement or writing or petition made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law;
>
> (3) Any written or oral statement or writing or petition made in a place open to the public or a public forum in connection with an issue of public interest or concern; or
>
> (4) Any other conduct in furtherance of the exercise of the constitutional right of petition or free speech in connection with a public issue or an issue of public concern.

O.C.G.A. § 9-11-11.1(c).

When a claim targets an act in furtherance of a right of petition or free speech on an issue of public interest or concern, the claim will be stricken "unless the court determines that the nonmoving party has established that there is a probability that the nonmoving party will prevail

on the claim." O.C.G.A. § 9-11-11.1(b)(1). In making this determination, the court is to "consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." *Id.* § 9-11-11.1(b)(2). An award of attorney's fees and expenses is mandatory if the moving party prevails on a motion to strike under the Georgia anti-SLAPP statute. *Id.* § 9-11-11.1(b.1).

### 3. The Current Anti-SLAPP Statute Applies in the Context of This Motion

#### a. The Current Anti-SLAPP Statute Applies in Federal Court

As noted previously, the complaint verification procedure in the prior anti-SLAPP statute that was the focus of the Eleventh Circuit's holding in *Royalty Networks* has now been eliminated from the Georgia anti-SLAPP statute, thus removing any obstacle to the current anti-SLAPP statute being applied in federal court. Indeed, both the Eleventh Circuit and the Northern District of Georgia before it took pains to distinguish cases interpreting the California statute, as federal courts in California and elsewhere routinely apply the California anti-SLAPP statute to state law claims in federal court. *See*, *e.g.*, *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1272 (9th Cir. 2013); *Batzel v. Smith*, 333 F.3d 1018, 102-–26 (9th Cir. 2003); *Tobinick v. Novella*, 108 F. Supp. 3d 1299, 1305 (S.D. Fla. 2015) *appeal pending*. Now that the legislature has enacted a statute that tracks the statute in California, there is no question but that the amended statute applies in this Court.

#### b. The Anti-SLAPP Statute Applies Prospectively to This Motion

In addition to the fact that the California anti-SLAPP statute, which the Georgia law now emulates, is routinely applied in federal courts, it has also consistently been applied "retroactively" in cases filed prior to enactment or amendment of that statute, where a motion to strike under the statute was filed after enactment or amendment. *American Dental Ass'n v. Khorrami*, 2004 WL 3486525, at *9-10 (C.D. Cal. Jan. 26, 2004); *Soukup v. Law Offices of*

*Herbert Hafif*, 139 P.3d 30, 43 (Cal. 2006); *Physicians Comm. for Responsible Medic. v. Tyson Foods*, 113 Cal. Rptr. 3d 926, 933 (Cal. Ct. App. 2004); *Brenton v. Metabolife Int'l, Inc.*, 10 Cal. Rptr. 3d 702 (Cal. Ct. App. 2004); *Robertson v. Rodriguez*, 42 Cal. Rptr. 2d 464 (Cal. Ct. App. 1995). For the reasons discussed in those cases, the same result should obtain here.

First, the operative mechanism in the amended anti-SLAPP statute is the motion to strike, which governs motions filed by defendants against a claim of relief arising from protected speech. While RFP filed its Complaint prior to the date the statute was amended, the Greenpeace Defendants are filing their motion to strike ***now***, well after the law took effect. That is, the statute in place currently permits Defendants to make a motion to strike at the present time. To deny Defendants that option because RFP raced to the courthouse after the amendment was signed into law, but before it became effective, would pervert the intent of the legislature.

This is consistent with the case law on retroactivity of the California anti-SLAPP law. Where a statute does not "impose new, additional or different liabilities based on past conduct," it should be applied to cases filed before the statute's effective date. *Brenton*, 10 Cal. Rptr. 3d at 709 (citations omitted). As such, statutes directed to remedies may be applied "retroactively" because "all statutory remedies are pursued with full realization that the legislature may abolish the right ... at any time." *Id.* at 710 (noting that calling application of remedial statutes "retroactive" is in fact a misnomer because "[t]he effect of such statutes is actually prospective in nature since they relate to the procedure to be followed in the future." *Id.* at 709 (citations omitted). Here, the amended Georgia anti-SLAPP statute does not impose new liabilities based on past conduct or alter substantive rights of the parties. *See Robertson*, 42 Cal. Rptr. 2d at 469 (citing *Wilcox*, 33 Cal. Rptr. 2d at 455) (new anti-SLAPP statute did "not change the legal effect of past conduct" but was a "screening mechanism for determining whether a plaintiff can

demonstrate sufficient facts to establish a prima facie case to permit the matter to go to a trier of fact. Therefore, the statute is applicable to a cause of action which arose before its effective date.", *id.* at 469); *American Dental Ass'n*, 2004 WL 3486525, at *9-10.

In *Physicians Committee for Responsible Medicine*, the plaintiff argued that federal decisions labeling the California anti-SLAPP statute "substantive" in the context of applying the statute in federal court directly conflicted with treating the same statute as "procedural" for purposes of retroactivity. 13 Cal. Rptr. 3d at 933 (considering *Newsham*, 190 F.3d at 973, and *Batzel*, 333 F.3d at 1025). The court explained that this was a false conflict:

> The procedural issue adjudicated in *Batzel* bears no analogy to the issue on appeal in this case, but we recognize that the court accurately analyzed the statute as shielding defendants from the burden of trial of meritless claims. In this respect, the anti-SLAPP statute serves an interest analogous to a limited immunity from suit. But statutory remedies commonly serve an interest in efficient and early adjudication that diminishes the burden of litigation.… The importance of this interest does not transform the statute to anything other than a statutory remedy. Thus, the fact that the anti-SLAPP statute shields litigants from trial of meritless claims arising from the exercise of first amendment freedoms does not alter the fact that it serves as a mechanism for early adjudication of such claims, in other words, as a statutory remedy.

13 Cal. Rptr. 3d at 933.[5]

In *Godin v. Schencks*, 629 F.3d at 86-87, cited by the Eleventh Circuit in *Royalty Network*, the First Circuit, addressing the application of the Maine anti-SLAPP law in federal court, observed that the anti-SLAPP law had both substantive and procedural aspects and that the two were intertwined, finding that the federal rules were not so broad as to "displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right." *Id.* at 87 (internal quotation marks

---

[5] One court has failed to recognize this distinction, incorrectly finding that either a statute is substantive and thus not retroactive or procedural and inapplicable in federal court. *Sherrod v. Breitbart*, 843 F. Supp. 2d 83, 84-85 (D.D.C. 2012), *aff'd*, 720 F.3d 932 (D.C. Cir. 2013).

and citation omitted); *see Brenton*, 10 Cal. Rptr. 3d at 709 ("It is the effect of the law, not its form or label, that is important for purposes of this analysis."); *Tobinick v. Novella*, 108 F. Supp. 3d at 1305 ("Although framed as a rule of state procedure, California's anti-SLAPP statute protects substantive rights and thus applies in federal court."). Here, just like the California law, the Georgia anti-SLAPP statute clearly applies in federal court based on relevant precedent and because it is part of Georgia's "framework of substantive rights or remedies"; however, for the purposes of retroactivity, the amended statute uses mechanisms which are "procedural" in the "ordinary use of the term," and thus can be applied to cases filed prior to the effective date of the new amendment.

**B.     RFP's Claims Should be Stricken Pursuant to the Anti-SLAPP Statute**

Although the amended anti-SLAPP statute has not yet been interpreted by any Georgia state or federal court, the California anti-SLAPP statute has been held to "establish[] 'a two-step process for determining' whether an action should be stricken ...." *See Varian Medic. Sys., Inc. v. Delfino*, 106 P.3d 958, 966 (Cal. 2005) (citation omitted). First, "a defendant 'must make an initial prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's rights of petition or free speech.'" *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1110 (9th Cir. 2003) (citation omitted). Once that showing is made, the burden shifts to plaintiff to demonstrate "a probability of prevailing on the claim." *Varian Medic. Sys.*, 106 P.3d at 966 (internal quotation marks and citation omitted).

**1.     RFP's Claims Are Subject to an Anti-SLAPP Motion**

In order to meet its burden of showing that a suit arises from its act of free speech, a defendant must show that plaintiff's claims arise from "any written ... statement or writing" on a public issue, or "any other conduct in furtherance of the exercise of ... the constitutional right of free speech in connection with a public issue or an issue of public interest." O.C.G.A. § 9-11-

11.1(c).  As it is "the principal thrust or gravamen of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies ….," *Martinez v. Metabolife Int'l, Inc.*, 6 Cal. Rptr. 3d 494, 499 (Cal. Ct. App. 2003) (emphasis omitted), courts have held that this type of comprehensive language reaches "all kinds of claims" relating to speech about public issues. *Jarrow Formulas, Inc. v. LaMarche*, 74 P.3d 737, 744-45 (Cal. 2003).  *See also Greater L.A. Agency on Deafness, Inc. v. CNN, Inc.*, 742 F.3d 414, 422 (9th Cir. 2014); *Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*, 946 F. Supp. 2d 957, 980 (N.D. Cal. 2013) (tortious interference); *New.net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1113-15 (C.D. Cal. 2004) (trade libel and tortious interference).

For all of the reasons stated in the Greenpeace Defendants' concurrent motion to dismiss pursuant to Rule 12(b)(6), RFP's claims in this case are defamation claims masquerading as other causes of action.  Therefore, the Court must pierce the labels that RFP has placed on its causes of action and find that the gravamen of all of RFP's claims is to squelch protected speech. Further, as also noted in the Greenpeace Defendants' motion to dismiss, there is no question that speech on environmental issues, and on a particular company's poor environmental record, is speech that is "in connection with public issues or issues of public interest."  To illustrate this, consider *Thornhill v. Alabama*, the seminal Supreme Court case on picketing. Replacing references to labor issues with environmental issues in a key part of that decision is highly instructive:

> In the circumstances of our times the dissemination of information concerning the facts of ~~a labor~~ an environmental dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution.  It is recognized now that ~~satisfactory hours and wages and working conditions~~ sustainable practices in industry … have an importance which is not less than the interests of those in the business or industry directly concerned.  The health of the present generation and of those as yet unborn may depend on these matters, and the practices in a

single ~~factory~~ company may have economic repercussions upon a whole region . . . . The merest glance at State and Federal legislation on the subject demonstrates the force of the argument that ~~labor relations~~ environmental issues are not matters of mere local or private concern. Free discussion concerning the conditions in industry and the causes of ~~labor~~ environmental disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society.

310 U.S. 88, 102-03 (1940) (deletions in strike-though, additions underlined) (internal citations omitted). While RFP would like to convince this Court that critical statements about its environmental practices should not be considered speech touching on public interests, this is demonstrably false and the burden must shift to RFP to show that it can prove its claims.

### 2. RFP Cannot Establish a Probability of Prevailing on Its Claims

Under the anti-SLAPP statute, RFP next must show a "probability" that it "will prevail on [its] claim[s]." O.C.G.A. § 9-11-11.1(b)(1). RFP cannot, however, rely on bare allegations to try to show that the complaint would survive a demurrer. *See Navellier v. Sletten*, 131 Cal. Rptr. 2d 201, 211 (Cal. Ct. App. 2003). Instead, RFP must "establish evidentiary support for [its] claim." *Id.* at 210-211 (internal quotation marks, citation, and emphasis omitted). Specifically, RFP must demonstrate that its claims are "supported by a prima facie ***showing of facts to sustain a favorable judgment*** if the evidence submitted by the plaintiff is credited." *Taus v. Loftus*, 151 P.3d 1185, 1204 (Cal. 2007) (emphasis added) (citation omitted). Otherwise, the court must strike the complaint.

### a. RFP Cannot Demonstrate a Probability Of Success On The Merits Of Its Defamation Claim

#### (1) The Allegedly Defamatory Statements are Time-Barred, Made by Non-Defendants, or Are Mere Opinion

The Greenpeace Defendants have set forth at length in their motion to dismiss the reasons RFP's claims fail due to application of the defamation statute of limitations; the fact that the

majority of statements were not made by defendants; and that the remaining statements are opinion based on disclosed scientific reports, official reports, independent audits, and other similar materials.[6] Those arguments are incorporated by reference, to the extent the Court finds any of the Greenpeace Defendants' arguments require reference to facts outside the pleadings.

**(2)      The Allegedly Defamatory Statements Are Substantially True and, In Any Event, Not Made With Actual Malice**

Plaintiffs have not and cannot state a libel claim for the simple reason that all of the challenged statements are true. The essence of the tort of libel is the publication of a statement that is both false and defamatory.  O.C.G.A. § 51-5-1(a). Accordingly, "[t]ruth is an absolute defense under Georgia law: if plaintiff cannot prove falsity, the libel and slander claim must fail." *Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1349 (N.D. Ga. 2003); *see also Bird v. Weis Broad. Corp.*, 388 S.E.2d 710, 711 (Ga. Ct. App. 1989).  The law of libel "overlooks minor inaccuracies and concentrates on substantial truth."  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516-17 (1991); *see also Stange v. Cox Enters., Inc.*, 440 S.E.2d 503, 507 (Ga. Ct. App. 1994) ("minor factual errors which do not go to 'the substance, the gist, the sting' of the story" are not actionable) (quoting *Masson*, 501 U.S. at 516).  In other words, "a statement" is not considered false unless it "'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'"  *Masson*, 501 U.S. at 517 (citation omitted).  "Substantial truth is all that is required."  *Monge v. Madison Cty. Record, Inc.*, 802 F. Supp. 2d 1327, 1333 (N.D. Ga. 2011).

---

[6] The court must consider the publication as a whole, including documents to which the publication links or otherwise refers to.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Muller-Paisner v. TIAA*, 289 Fed. App'x 461, 466 n.5 (2d Cir. Aug. 15, 2008); *Hoffman-Pugh v. Ramsey*, 312 F.3d 1222, 1225 (11th Cir. 2002); Horsely v. Feldt, 304 F.3d 1125, 1134 (11th Cir. 2002).  Many of those can properly be considered subject to judicial notice and can properly be considered on a motion to dismiss, as well as under the anti-SLAPP statute.

As noted in the Greenpeace Defendants' motion to dismiss, statements that are unambiguous or can have only one interpretation read in context, constitute a question of law for the Court after RFP meets its burden of proving substantial falsity. *Adventure Outdoors, Inc. v. Bloomberg*, 552 F.3d 1290, 1298 (11th Cir. 2008) (citing *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 768-69 (1986)). Even if some or all of the statements were not true, which they are, Plaintiffs could not demonstrate a probability of prevailing on their burden of coming forward with "affirmative evidence" to allow a reasonable reader to find on clear and convincing evidence, that they knew what they published was false or had, in fact, serious doubts of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 257 (1986).[7] To withstand a motion to strike under the applicable anti-SLAPP statute, RFP has the burden of showing "a probability that it will prevail" on both its burden of proving substantial falsity and actual malice. Below, we set forth why RFP cannot make the necessary showing since the statements challenged by RFP are all substantially true and, in any event, were not published with actual malice. Applying the standards set forth above, it is clear that Plaintiffs' Complaint cannot withstand this motion.[8]

As set forth in the Complaint, the challenged statements fall into several primary categories, and the various alleged defamatory statements that Plaintiffs contend fall into these categories are substantially true and should be dismissed from suit.

> (a) **Resolute's logging practices violate FSC certification standards which incorporate Canadian forestry guidelines and Resolute's Forest Stewardship Council**

---

[7] *See* Mot. to Dismiss § B(3)(e) (failure to state a claim on actual malice).

[8] *Monge*, 802 F. Supp. 2d 1327 (dismissing defamation action against defendant newspaper because newspaper reported the truth in stating the plaintiff, an attorney, did not attend a deposition); *Geller v. Von Hagens*, 2010 WL 4867540 (M.D. Fla. Nov. 23, 2010) (granting defendant's motion to dismiss because plaintiff previously entered settlement agreement requiring it to state on website that it could not disprove statement that bodies on display in Bodies Exhibition were illegal obtained, and instructing plaintiffs to "re-plead to show facts that indicate the falsity of the statements").

**certificates have been suspended as a result of serious deficiencies in Plaintiffs' logging operations.[9]**

The Forest Stewardship Council is an independent nonprofit organization established to promote the responsible and sustainable management of the world's forests.[10] The FSC is a voluntary scheme that independently inspects and evaluates forestry operations for sustainability practices, compliance with local laws, respect for Indigenous peoples' rights, the health, safety and rights of forest workers, and the provision of a wide range of other social benefits.[11] To acquire and maintain FSC certification, forestry companies operating in the Canadian Boreal Forest must ensure on-the-ground compliance with the FSC National Boreal Standard and these practices are audited by independent firms.[12] Failing to meet FSC requirements can lead to auditors issuing non-conformances. When a certificate holder fails or is unwilling to adjust operations within the timeframe set by the FSC and auditors, certificate suspension and terminations will result.

RFP has had four of its FSC certificates in Lac St-Jean, Quebec and Northern Ontario – totaling an area of over 8 million hectares of Boreal Forest – terminated (Mistassini-Peribonka, Lac St-Jean and Caribou Forest)[13] or suspended (Dog River).[14] The independent auditors of Rainforest Alliance hired by RFP identified 13 major non-compliances with the FSC National

---

[9] *See* Compl. ¶¶ 125-134, 280(d), n.5, App. E.

[10] *See* Koonce Decl. Ex. 2 (Forest Stewardship Council (FSC) Canada fact sheet, "Introduction to the Forest Stewardship Council").

[11] *See* Koonce Decl. Ex. 3 (Forest Stewardship Council (FSC) Canada fact sheet, "FSC Forest Management Certification"); *id.* Ex. 4 (Forest Stewardship Council Canada Working Group *National Boreal Standard*, Aug. 6, 2004).

[12] *See* Koonce Decl. Ex. 5 (Forest Stewardship Council webpage on Certification Bodies).

[13] *See* Koonce Decl. Ex. 6 (Forest Stewardship Council webpage providing certification data on PF Résolu Canada Inc. (Mistassini-Péribonka); *id.* Ex. 7 (Forest Stewardship Council webpage providing the certification data on PF Résolu Canada Inc. (Lac St. Jean); *id.* Ex. 8 (Forest Stewardship Council webpage providing the certification data on PF Résolu Canada Inc. (Caribou Forest).

[14] *See* Koonce Decl. Ex. 9 (Rainforest Alliance "Statement on Resolute Forest Products," dated May 21, 2014).

Boreal standard in two Lac St-Jean certificates. In particular, the auditors reported the following areas of non-compliance[15]:

- By not including the maintenance of old-growth forests and the identification of protected areas in their assessment of sustainable cut levels, RFP risks cutting too much wood over and above what the forest can sustainably provide. The Mistassini audit for example found a "failure to demonstrate the full range of old forests is maintained," and provided scientific literature to support this conclusion.

- FSC requires the conservation of the habitat of endangered species, but RFP has not implemented the precautionary principle in designating where cutting occurs, is increasing fragmentation of key habitat and putting caribou at further risk.

- RFP has not ensured adequate levels of old-growth forest areas in their tenures.

- RFP's development plans do not adequately address the conservation of woodland caribou habitat.

- RFP has not established a resolution process for conflict resolution with the Innu of Masteuiash.

- Lack of support for indigenous peoples to assess the impact of logging on their territory.[16]

In their March 2014 official statement on the suspension of three certificates (Dog River, Mistassini-Preibonka, and Lac St-Jean), RFP committed to do everything possible to recover these certificates before termination and meet its commitment to achieve FSC certification on 80% of its operations.[17] Despite its statement, the Mistassini-Peribonka certificate was

---

[15] In May 2014, RFP sued the Rainforest Alliance and two individual auditors personally to enjoin Rainforest Alliance "from releasing, publishing, distributing, communicating or otherwise disseminating the Audit Reports...." *Resolute FP Canada Inc. v. Rainforest Alliance, Inc.*, et al., Court File No. CV-2014-171, Statement of Claim, June 5, 2014, Ontario Superior Court of Justice. Koonce Decl. Ex. 10. In February 2015, the suit was settled out of court and, as part of the settlement, a new audit was conducted more favorable to RFP.

[16] *See* Koonce Decl. Ex. 11 (Rainforest Alliance "Public Summary Report for Forest Management 2013 Annual Audit Report for PF Résolu Canada Inc. (Mistassini-Péribonka) in Dolbeau-Mistassini, QC," dated Dec. 11, 2013); *id.* Ex. 12 (Rainforest Alliance "Public Summary Report for Forest Management 2013 Annual Audit Report for Produits forestiers Résolu (Lac St-Jean) FMUs 022-51 and 025-51 in Lac St-Jean, Quebecin Dolbeau-Mistassini, QC," dated July 9, 2013).

[17] *See also* Koonce Decl. Ex. 13 (Forest Stewardship Council FSC Canada article titled "Resolute Forest Products' FSC Forest Management Certificates to be suspended," dated Dec. 12, 2013).

terminated in December 2014.[18]  Subsequently the certificate for Caribou Forest was terminated in January 2015.[19]

Rather than making a concrete effort to regain their FSC certificates, RFP prefers to blame the government, lobby to block better protection of the forest, sue its own auditors, and bring lawsuits against its critics.  However, RFP's defamation challenge to any Greenpeace statements commenting on RFP's lost FSC certificates must fail because Greenpeace's statements are supported by FSC's own records, available online to the public, and are thus, substantially true.

(b)     **Resolute is engaged in destructive and unsustainable logging activities in Canada's Boreal Forest.[20]**

There are two vast areas in northern Quebec in which scientifically-recommended levels of old growth forests are not being maintained.  Operations in these two areas, and the logging company responsible for the certificates overlapping them – RFP – were publicly and independently audited by The Rainforest Alliance in 2013.[21]  Shortcomings in maintaining adequate levels of old growth forest was one of several issues which led to the termination of RFP's Forest Stewardship Council (FSC) certificates for this 5.6 million hectare (over 13 million acres) swathe of Canada's Boreal Forest.[22]

Major shortcomings of the company's operations are well documented.  They include failing to conserve the long term health of specific areas of the Canadian Boreal Forest , logging in critical caribou habitat in Ontario[23] and Quebec, and operating without the consent of First

---

[18] *See* Koonce Decl. Ex. 6.

[19] Koonce Decl. Ex. 14 (Forest Stewardship FSC Canada webpage article titled "Resolute Forest Products" Caribou Forest FSC Certificate Terminated," dated Jan. 13, 2015)

[20] *See* Compl. ¶¶ 84-99, 280(a), n.1, App. A.

[21] Koonce Decl. Exs. 6 and 7.

[22] *See supra* § B(2)(a)(2)(a).

[23] The Ontario Ministry of Natural Resources and Forestry issued a report in December 2014, finding that "[t]he amount of area, inferred as functional [woodland caribou] habitat loss identified from the disturbance analysis

Nations in the traditional territories.[24]  These and other major shortcomings in the company's social and environmental performance led, in January 2014, to the Forest Stewardship Council suspending three of RFP's certificates in Quebec and Ontario covering an unprecedented 8 million hectares of forest.[25]  In suspending, and then terminating RFP's certificates, the FSC upheld the Grand Council of the Crees' complaint against the company for engaging in logging operations without consent, validated the independent auditors' conclusion that there is "a high risk to the extirpation of caribou herds" in the Montagnes Blanches, acknowledged that RFP had failed to demonstrate that "the value of forest will be maintained through time" in Northern Ontario, and confirmed that RFP demonstrated an unwillingness to collaborate with stakeholders.

The Greenpeace Defendants' position that the above shortcomings confirm that RFP has engaged in unsustainable operations within these areas is substantially true.  Indeed, RFP's failures to adhere to recommended sustainable practices sharply contrast with the collaborative efforts of other similarly-sized logging companies in the region, such as Tembec, which has been commended for collaborating with ENGOs and stakeholders to device joint solutions aimed at achieving, for example, woodland caribou habitat conservation.[26]  As further detailed below, there are ample, undisputed facts supporting the Greenpeace Defendants' statements criticizing RFP for unsustainable logging practices, and for this reason any challenged statements regarding

---

amounts to 960,607 ha, or 43.5% of the Brightsand Range."  Koonce Decl. Ex. 15 (Ontario Ministry of Natural Resources and Forestry, Species at Risk Branch, report titled, "Integrated Range Assessment for Woodland Caribou and their Habitat, Brightsand Range 2011," dated December 2014).    .  This exceeds the Federal guidance for maintaining undisturbed caribou habitat.  *See infra* § B(2)(a)(2)(d).  The Brightsand herd range overlaps in very large part with the Caribou Forest unit managed by RFO and whose FCS certificate for the area was terminated.  *See supra* note 13.

[24] *See infra* § B(2)(a)(2)(e).

[25] *See supra* n. 13.

[26] *See* Koonce Decl. Ex. 16 (Tembec press release titled, "Collaboration leads to solutions for threatened woodland caribou and jobs," dated May 18, 2016) and Koonce Decl. Ex. 17 (Wildlands League press release titled, "Collaboration leads to solutions for threatened woodland caribou and jobs," dated May 18, 2016).

whether RFP has engaged in such destructive and unsustainable practices are not only protected opinion, but substantially true and, in any event, there is no affirmative evidence that the Greenpeace Defendants knew they were false or had substantial reason to doubt as their truth.

(c)     <strong>Resolute's logging operations have an impact on climate change.[27]</strong>

Boreal forests circle the globe at subarctic latitudes, covering more than 10 percent of the world's land area. As with tropical and temperate forests, boreal forests sequester and store carbon – both in surface vegetation and in associate soils, permafrost deposits, wetlands, and peatlands. According to scientific studies, Canada's Boreal Forest stores about 208.1 billion tons of carbon in forest and peatland ecosystems.[28] Accordingly it was not substantially false for Defendant Moas to publish that "the Boreal is the world's largest carbon absorbing ecosystem, purifying the air you breathe and keeping the climate stable," Suppl. App. 4 (B01).[29]

Defendant Moas' conclusion that RFP's logging efforts in one of the "largest intact forests in Canada," can "mea[n] bad news for the climate," Suppl. App. 1 (B03), is also supported by scientific literature. Forests continue to sequester carbon as they age, so older forests store more carbon. Scientific studies have thus concluded that natural forests store more carbon than forests managed for timber production due to their older average age.[30] Forest degradation unlocks the carbon[31] stored in the soil in a variety of ways[32] that scientists are still

---

[27] *See* Compl. ¶¶ 100-104, App. B.

[28] Koonce Decl. Ex. 18 (2009 report by M. Carlson, J. Wells, and D. Roberts for the Boreal Songbird Initiative and Canadian Boreal Initiative titled, "The Carbon the World Forget, Conserving the Capacity of Canada's Boreal Forest Region to Mitigate and Adapt to Climate Change") (citing Kurz, W.A., and M.J. Apps. 1999. A 70-year retrospective analysis of carbon fluxes in the Canadian forest sector. Ecological Applications 9: 526-547; Tarnocai, C. 2006. The effect of climate change on carbon in Canadian peatlands. Global and Planetary Change 53:222-232).

[29] Indeed, some experts calculate that the Boreal holds at least 22 percent of earth's land-based carbon. *See* Koonce Decl. Ex. 18.

[30] *Id.* (citing Kurz, W.A., S.J. Beukema and M.J. Apps. 1998. Carbon budge implications of the transition from natural to managed disturbance regimes in forest landscapes. Mitigation and Adaptation Strategies for Global Change 2: 405-421).

[31] Koonce Decl. Ex. 19 (article by Thomas Buchholz, et al. titled "Mineral soil carbon fluxes in forests and implications for carbon balance assessments," as published in Volume 6, Issue 4 of GCB Bioenergy).

19

exploring. When boreal forest vegetation or soils are disturbed, carbon is released, accelerating climate change.[33] Keeping boreal forest carbon reservoirs intact forestalls the release of carbon. Indeed, the FSC considers whether and how a logging operation seeking FSC certification would affect the carbon-storage capacity of the soil by asking questions about the crushing effects heavy machinery has on the dirt and the likelihood that changes in water patterns will erode the carbon-rich soil.[34] Thus, Defendant Moas's conclusion that by disrupting "one of the Earth's largest carbon sinks," the Canadian Boreal Forest, RFP "put[s] our global climate at risk," Suppl. App. 2 (Compl. Allegation 32), is a fair assessment of the available scientific literature, both protected opinion and substantially true. Given this supporting material, Plaintiffs will not be able to show a probability of prevailing on their burden of showing this was substantially false, much less that the Greenpeace Defendants knew it was false or had serious doubts.

> **(d)** **Resolute bears responsibility for the destruction of vast areas of Canada' Boreal Forest and destroyed critical woodland caribou habitat.[35]**

Recent studies show that disturbance levels in Quebec's woodland caribou critical habitat have skyrocketed in recent years, threatening the survival of this endangered species. The Canadian Federal government found that woodland caribou "recovery" requires "a minimum of 65% undisturbed habitat in a range as the disturbance management threshold, which provides a measurable probability (60%) for a local population to be self-sustaining."[36] In May 2012,

---

[32] Koonce Decl. Ex. 20 (article by Hosea Kato Mande, et al., titled "Forest Logging and It[s] Impact on Soil Carbon Dioxide Efflux in the tropical Forest, Peninsular Malaysia," as published in Volume 8, Issue 12, Ver. II of the IOSR Journal of Environmental Science, Toxicology and Food Technology, dated Dec. 2014).

[33] Impacts from land-use such as deforestation accounted for nearly 20% of global anthropogenic $CO_2$ emissions during the 1990s. Koonce Decl. Ex. 18, Intergovernmental Panel on Climate Change. Summary for policymakers. In: S. Solomon, D. Qin, M. Manning, Z. Chen, M. Marquis, K.B. Averyt, M. Tignor and H.L. Miller (eds.). Climate Change 2007 The Physical Science Basis. Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change, Cambridge University Press, Cambridge, New York, NY, USA.

[34] *See* Koonce Decl. Ex. 4.

[35] *See* Compl. ¶¶105-114, 280(c), n.3, App. C.

[36] Koonce Decl. Ex. 21 (Environment Canada's 2012 publication, "Recovery Strategy for the Woodland Caribou (*Rangifer tarandus caribou*), Boreal population, in Canada," Species at Risk Act, Recovery Strategy Series).

Quebec's Woodland Caribou Recovery Scientific Advisory Group[37] released assessments on the status of woodland caribou herds, indicating that several herds dependent on forest lands in the region including RFP's tenure, were not considered to be self-sustaining and faced decline failing urgent action to protect their habitat.[38] Then again, in May 2015, Quebec's Chief Forester, an independent officer of the national assembly of Quebec, warned in a report that current logging plans, including RFP's, would lead to the total disappearance of the species within decades.[39] The report shows that the Lac St-Jean region, where RFP is the most active, shows the most dramatic state for caribou with 92% of the species' range already too disturbed by logging and roads to be able to survive.[40] Furthermore, according to the 2013 Annual Audit for FSC certification, in Lac Saint-Jean (Montagnes Blanches), RFP failed to demonstrate that it "established management measures and targets that would reverse the trend" of caribou herds being at risk.[41] And, according to the 2013 Annual audit for FSC certification in Dolbeau-Mistassini (Montagnes Blanches), RFP failed to establish "a system for monitoring the level of disturbance in the distribution area or populations of woodland caribou," leading to "a high risk of the extirpation of caribou herds."[42]

Plaintiffs do not dispute that "FSC auditors deemed compliance with the government's regional caribou plan to be insufficient for Resolute," and that "Resolute was issued one major non-compliance for planning operations in unfragmented, intact forests…" Compl. ¶ 132(b). Moreover, the alleged defamatory statements at issue, in context with the entire publications, are thoroughly sourced with numerous scientific and governmental reports, including those cited

---

[37] The advisory group was commissioned by the Quebec Ministry of Natural Resources and Wildlife.
[38] Koonce Decl. Ex. 22 (September 2012 report by Tyler D. Rudolph, et al. titled "Status of Woodland Caribou (*Rangifer tarandus caribou*) in the James Bay Region of Northern Quebec").
[39] Koonce Decl. Ex. 23 (2014 report by the Bureau du forestier en chef, titled, "Caribou forestier – Effet des strategies actuelles d'amenagemont forestier sur les taux de perturbation de l'habitat").
[40] *Id.*
[41] Koonce Decl. Ex. 11.
[42] Koonce Decl. Ex. 12.

*supra*, recommending that limits be imposed on logging operations to protect caribou herds, citing the declining caribou populations in the regions where RFP engages in logging. For example, Defendant Moas' correspondence with McGraw Hill and Midland Paper attached the report "Endangered Forests in the Balance: The impact of logging reaches new heights in the Montagnes Blanches Endangered Forest," which provides an annotated, detailed account of the impact of RFP's unsustainable forest practices on woodland caribou.[43] The substantial truth of the Greenpeace Defendants' statements that RFP's logging "threatens wildlife like the woodland caribou," Suppl. App. 1 (C04), that RFP operations may "destro[y] critical habitat of the endangered woodland caribou," Suppl. App. 2 (Compl. Allegation 35), requires dismissal of such statements, as protected opinion and because Plaintiffs, cannot show a probability of prevailing on either substantial falsity or actual malice.

> (e) **Resolute is engaged in logging activities in the First Nations Communities' territories without their consent.[44]**

It is undisputed that RFP's FSC certifications were suspended, *see* Compl. ¶¶ 126 ("temporary suspensions"), 129 (same), 134 (same), and the FSC's website verifies that three of RFP's certifications have been terminated.[45] The basis for the Greenpeace Defendants' claim that Resolute is "ignoring" the rights of First Nations Communities in Canada was in part premised on those suspensions and the public complaints by the Grand Council of the Crees regarding Resolute's logging practices.[46] Compl. ¶ 132(a). In May 2013, the Grand Council of the Crees' complained to Accreditation Service International (ASI), the FSC auditors, that "in

---

[43] Suppl. App. 9-10.
[44] *See* Compl. ¶¶ 115-124, 280(b), n.4, App. D.
[45] *See* Koonce Decl. Exs. 6 and 7.
[46] Resolute has gone so far as to take legal action against First Nations Communities' leaders for protesting against Resolute operations. In May 2012, for example, Resolute brought an unsuccessful suit against Norman Matchewan, spokesman of the Algonquin First Nation, for mischief and obstruction of justice stemming from a 2009 peaceful blockade protecting his people's territory from logging.

conducting forestry operations contrary to the terms of [the Baril-Moses Agreement], despite clear refusal from the Crees, [Resolute] has quashed the Crees' consent for its forestry operations."[47] This complaint was significant because the rights of indigenous people to Free, Prior and Informed Consent (FPIC) before forestry operations start is a core condition of the FSC standard that every FSC certified company must obtain prior to operating.[48] ASI replied to the Crees' complaint in a report stating, in part:

> [T]he state of [Resolute's] engagement with the Cree does not suggest that significant efforts were made to contact Indigenous forest users and communities affected by or interested in forest management in the area under certification.
>
> ***
>
> ASI concludes that lack of agreement with the Cree is a systematic issue that suggests a fundamental failure in the application of free and informed consent that [Resolute] should have worked to resolve as a pre-requisite for certification.
>
> ***
>
> ASI concludes  not enough was done [by Resolute] to ensure that the basic conditions for free and informed consent were respected and, where necessary, renegotiated prior to certifying forest management practices that put Cree values at risk.[49]

The statements in suit, placed in their proper context, are premised on these undisputed facts – often cited and referenced in the publication itself. For example, the publication "Resolute Forest Products: Key risks and concerns for investors," Suppl. App. 8, annotates a summary of RFP's failure to adhere to the FSC's FPIC standard Accordingly, the Greenpeace Defendants' statements that Resolute has had "conflicts" with First Nations Communities and

---

[47] Koonce Decl. Ex. 24 (May 15, 2013 "Formal Complaint to Accreditation Services International (ASI) Regarding Forest Stewardship Council Certification RA-FM/COC-005956-by the Grand Council of the Crees (Eeyou Istchee)/Cree Regional Authority").

[48] Koonce Decl. Exs. 3 & 4.

[49] Koonce Decl. Ex. 25 (Apr. 7, 2014 ASI Complaint Investigation Report PUBLIC SUMMARY Grand Council of the Crees (Eeyou Istchee)/Cree Regional Authority (GCCEI/CRA) complaint against Rainforest Alliance Regarding: Rainforest Alliance's decision to close Major non-conformance #25/12 At RA-FM/COC-005956).

that such indigenous communities have stated that Resolute is engaging in logging activities without their consent are substantially true, and Plaintiffs will not be able to show a probability of succeeding on either substantial falsity or actual malice.

**b.** **RFP Cannot Demonstrate a Probability Of Success On The Merits Of Its Other Claims**

The reasons advanced above as to why the main categories of statements alleged in the complaint are substantially true apply not just to defeat RFP's claims as to the 26 specific statements actually in suit on RFP's defamation claim, but also to defeat all of RFP's claims based on similar statements whether they are time-barred or not, spoken by named defendants or not, or even whether they are pled as defamation or RICO claims. Not only is truth a defense to defamation, but if a statement is not false, such a statement could not be deemed fraudulent. *See* Mot. to Dismiss, §§ B(3), B(4). Nor could a statement that is not false be the basis for a conspiracy. While, under tortious interference law, other acts besides speech may be deemed interference, where the only acts alleged are statements, they cannot survive if the defamation claim cannot survive. Indeed, it is unclear how truthful statements could ever be deemed sufficient to state a claim, much less a probability to prevail on such a claim, since the cause of action requires both that the defendant act improperly and that it act with intent to injure. Finally, even RFP's trademark claim is subject to this motion to strike, because it involves the nominative use of RFP's purported trademark, which under the applicable case law clearly constitutes protected speech on an issue of interest to the public. *Id.* § B(5).

This 8th day of September, 2016.

Respectfully submitted,

/s/   Thomas W. Tucker
Thomas W. Tucker                          Laura Handman (admitted *pro hac vice*)
Georgia Bar No. 717975                    Lisa Zycherman (admitted *pro hac vice*)
TUCKER LONG, PC                           DAVIS WRIGHT TREMAINE, LLP
453 Greene Street                         1919 Pennsylvania Avenue, NW, Suite 800
Augusta, Georgia 30901                    Washington, DC 20006-2401
(706) 722-0771                            (202) 973-4200
ttucker@tuckerlong.com                    laurahandman@dwt.com
                                          lisazycherman@dwt.com

                                          Lacy H. Koonce, III (admitted *pro hac vice*)
                                          DAVIS WRIGHT TREMAINE, LLP
                                          1251 Avenue of the Americas, 1st Floor
                                          New York, NY 10020-1104
                                          (212) 603-6467
                                          lancekoonce@dwt.com

*Attorneys for Defendants Greenpeace International, Greenpeace, Inc., Daniel Brindis, Amy Moas, Matthew Daggett, and Rolf Skar*

## CERTIFICATE OF SERVICE

This is to certify that on the 8th day of September, 2016, I have served all parties in this case in accordance with the directives from the Court Notice of Electronic Filing ("NEF") which was generated as a result of electronic filing.


   /s/ Lisa B. Zycherman
LISA B. ZYCHERMAN (Admitted *Pro Hac Vice*)